J-S54009-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LAWRENCE P. TOOMBS | : | |
| | : | |
| Appellant | : | No. 1507 WDA 2016 |

Appeal from the Judgment of Sentence May 19, 2016
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-CR-0000708-2015

BEFORE: OTT, J., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED OCTOBER 13, 2017**

Lawrence P. Toombs appeals, *nunc pro tunc*, from the judgment of sentence imposed May 19, 2016, in the Washington County Court of Common Pleas. The trial court sentenced Toombs to an aggregate term of 16 to 32 months' imprisonment following his bench conviction of forgery and related charges.[1] On appeal, Toombs challenges the weight and sufficiency of the evidence supporting his convictions. For the reasons below, we affirm.

The relevant facts underlying Toombs's arrest and conviction are summarized by the trial court as follows:

_____

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S. § 4101(a)(3).

On October 23, 2014, [Toombs,] a member of the Washington Community Federal Credit Union, now known as CHROME Federal Credit Union (hereinafter "credit union"), appeared at the Griffin Avenue branch office to complete a financial transaction. According to Susan Guffey, a teller at the credit union, [Toombs] presented himself to her with a check payable to him dated October 15, 2014[,] for six thousand eight hundred and eighty dollars and thirty cents ($6,880.30). The teller testified that the check was a "non-recognized check," meaning that it was not a local paycheck, a social security check, a pension check, or a check from "companies in the area." In addition, the check was not drawn on a bank doing business in Washington County. Consequently, the teller inquired about the type of check [Toombs] was presenting. [Toombs], however, did not understand the teller's question. She, therefore, asked [him] where he got the check, to which he responded "the mail" because "he won a sweepstakes."

[Toombs's] response drew the teller's concern that the check may be a scam. As a result, the teller asked [Toombs] what kind of sweepstakes had he won, but [Toombs] was unable to answer the question. [Toombs] gave the teller a letter (that accompanied the check) which she described as "bogus" looking because "there were cut and paste icons at the top." The teller then informed [Toombs] that the check looked fraudulent and advised him to report this matter to the police so that they could investigate. This answer did not satisfy [Toombs]. Therefore, the teller left her station to inquire with the deposit process department.

The teller showed the check and letter to the head of the deposit process department. That person also believed that the check was fraudulent and advised the teller not to accept it for deposit. Again, the teller informed [Toombs] that the credit union was unable to accept the check and suggested that he notify the police because this was a scam. [Toombs] then left with the check and the letter.

The following day, [Toombs] presented himself to the Racetrack Road office of the credit union to deposit the same check. A teller at this branch accepted the endorsed check and put a two-business day hold on the amount for deposit into [Toombs's] savings account. A hold is customary for a large check deposit. The hold should have been for five days,

according to credit union policy, because the check was greater than $5,000.

On October 28, 2014, $6,500 was withdrawn from [Toombs's] credit union savings account at the Racetrack Road office. The withdrawal receipt for the $6,500 included the driver's license number for the person making the withdrawal request. The number belonged to [Toombs's] Pennsylvania Driver's License. [Toombs] ultimately depleted all $6,880.30 from his savings account.

After these withdrawals, the credit union received notice from Mid-Atlantic, the clearinghouse company used for processing checks, that the $6,880.30 check that [Toombs] deposited on October 24, 2014[,] was fraudulent. More specifically, on October 29, 2014, Mid-Atlantic returned the check with the words "altered or fictitious" stamped thereon.

Anthony Vincequerra, a collector for the credit union, contacted [Toombs] after being notified by Mid-Atlantic that the check was "altered or fictitious." [Toombs] informed Mr. Vincequerra that he had already spent the money on a car. Thereafter, Mr. Vincequerra attempted to schedule several meetings with [Toombs] to discuss converting the $6,880.30 into a car loan with the credit union having a lien on the title. Each time[, Toombs] responded that he was unable to make the meeting. Consequently, Mr. Vincequerra contacted the Pennsylvania State Police.

Trooper [Douglas] Arndt was assigned to the case to investigate and he contacted [Toombs] by telephone on December 11, 2014[,] to discuss the matter. [Toombs] stated that he did not purchase a car with the $6,880.30 check. Further, [he] told Trooper Arndt that he won the Publisher's Clearinghouse Sweepstakes. The check that [Toombs] received, however was from ROAR Logistics. The trooper informed [Toombs] that he must contact the credit union by December 19, 2014[,] to make payback arrangements. [Toombs] never contacted the credit union.

Trial Court Opinion, 11/17/2016, at 1-4 (record citations omitted).

On January 8, 2015, Trooper Arndt filed a criminal complaint charging

Toombs with forgery, theft by unlawful taking, theft by deception, and bad

checks.[2]  An additional count of receiving stolen property ("RSP")[3] was later

added by information.  On January 8, 2016, Toombs entered a plea of *nolo*

*contendre* to all charges except RSP.  However, on April 18, 2016, the trial

court granted Toombs's pre-sentence motion to withdraw the plea.  The case

proceeded to a non-jury trial on May 19, 2016.  The trial court found

Toombs guilty of all charges, and sentenced him, that same day, to three

concurrent terms of 16 to 32 months' imprisonment on the charges of

forgery, theft by deception, and bad checks.[4]  The court also found Toombs

was RRRI[5] eligible, which reduced his minimum sentence to 12 months'

imprisonment.

Toombs filed a timely post-sentence motion challenging the weight of

the evidence.  The trial court denied the motion on July 11, 2016, but

Toombs failed to file a timely appeal.  Thereafter, on September 29, 2016,

Toombs's attorney filed a petition for reinstatement of his direct appeal

---

[2] **See** 18 Pa.C.S. §§ 4101(a)(3), 3921(a), 3922(a)(1), and 4105(a)(1), respectively.

[3] **See** 18 Pa.C.S. § 3925(a).

[4] The trial court found the charges of theft by unlawful taking and RSP merged for sentencing purposes with the count of theft by deception.  **See** N.T., 5/19/2016, at 95.

[5] Recidivism Risk Reduction Incentive, 61 Pa.C.S. § 4501, *et seq*.

rights *nunc pro tunc*, which the trial court granted that same day. This timely appeal followed.[6]

Based on our disposition, we will address Toombs's claims together. In his first issue, Toombs argues the evidence was insufficient to support his convictions.[7] With respect to the charges of forgery and bad checks,[8] Toombs contends the evidence did not establish he either forged the check, or knew it was fraudulent when he presented it for payment. **See** Toombs's Brief at 14-15. Toombs emphasizes that Ms. Guffey could not pinpoint "a

_____

[6] On October 14, 2016, the trial court ordered Toombs to file a concise statement of errors complained of on appeal. Toombs complied with the court's directive, and filed a concise statement on November 3, 2016.

[7] Our review of a sufficiency claim is well-settled. We must

> examine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, support the jury's finding of all the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence.

**Commonwealth v. Biesecker**, 161 A.3d 321, 326 (Pa. Super. 2017) (quotation omitted). Furthermore, we will not "re-weigh the evidence and substitute our judgment for that of the fact-finder." **Commonwealth v. Ford**, 141 A.3d 547, 553 (Pa. Super. 2016) (quotation omitted), *appeal denied*, 164 A.3d 483 (Pa. 2016).

[8] **See** 18 Pa.C.S. §§ 4101(a)(3) (a person commits forgery if, "with the intend to defraud … or with knowledge that he is facilitating a fraud … the actor … utters any writing which he knows to be forged[.]"), and 4105(a)(1) (a person commits the crime of bad checks if he "passes a check … for the payment of money, knowing that it will not be honored by the drawee.").

single defect" on the check that would identify it as fraudulent, and she "did not confiscate the check as an attempt to pass a fraudulent check, but instead returned the check to Toombs." **See id.** at 14, 16. With respect to the theft and RSP charges,[9] Toombs maintains the evidence failed to prove he had the intent to deprive the credit union of its property. **See id.** at 17-18. Although he did withdraw the proceeds of the check from his savings account, Toombs points out that he was paying the money back *via* a "direct deposit which was made monthly on [his] behalf." **Id.** at 17.

In his second issue, Toombs challenges the weight of the evidence supporting his conviction.[10] Specifically, he claims the trial court "afforded too much weight on the stamp 'altered/fictitious'[, that appeared on the

_____

[9] **See** 18 Pa.C.S. §§ 3921(a) (a person is guilty of theft "if he unlawfully takes, or exercises control over, moveable property of another with intent to deprive him thereof"), 3922(a)(1) (a person is guilty of theft by deception if he "intentionally obtains or withholds property of another by … [creating or reinforcing] a false impression"), and 3925(a) (a person is guilty of RSP if he "intentionally receives[ or] retains … moveable property of another knowing that it has been stolen, or believing that it has probably been stolen").

[10] When reviewing a weight of the evidence claim,

> an appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court abused its discretion in making its determination.

**Commonwealth v. Lyons**, 79 A.3d 1053, 1067 (Pa. 2013), *cert. denied*, 134 S. Ct. 1792 (U.S. 2014). We note Toombs properly preserved his weight of the evidence claim by raising the issue in a timely post-sentence motion before the trial court. **See** Pa.R.Crim.P. 607(A)(3).

returned check,] in making its ultimate determination of the issues." *Id.* at 18-19.

Upon our review of the record, the parties' briefs, and the relevant statutory and case law, we conclude the trial court properly disposed of Toombs's issues on appeal in its opinion filed on November 17, 2016. *See* Trial Court Opinion, 11/17/2016, at 6-12 (finding (1) evidence was sufficient to support Toombs's convictions of forgery, bad checks, and theft by deception when Toombs presented the check for deposit **the day after** two employees - at another branch - informed him the check was fraudulent, and instructed him to take the check to the police; (2) when Toombs presented the check for deposit, he knew he was facilitating a fraud and the check would not be honored; (3) "the mere presentment and deposit of a fraudulent check" supports a conviction of theft by deception;[11] (4) the fact that a small electronic deposit was transferred monthly into Toombs's account did not demonstrate he lacked the intent to defraud the credit union because the deposit was "established before [Toombs] deposited the fraudulent check"[12, 13]; and (5) Toombs's subsequent behavior in (a) failing

_____

[11] Trial Court Opinion, 11/17/2016, at 9.

[12] *Id.* at 10.

[13] We note the trial court did not specifically address the evidence supporting Toombs's convictions of theft by unlawful taking and RSP because it found those charges merged with theft by deception. *See id.* at 8, 10. However, based upon the evidence outlined above, we find Toombs's actions in
*(Footnote Continued Next Page)*

to show up for two scheduled meetings with Vincequerra, (b) providing two different stories as to how he spent the money, and (c) failing to contact the credit union to make payment arrangements after being instructed to do so by police, evidenced his "guilty knowledge" so that the verdict was not against the weight of the evidence). Accordingly, we rest on the court's well-reasoned bases.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/13/2017

---

*(Footnote Continued)*

depositing a check he knew was fraudulent, then withdrawing the funds and refusing to repay them, supports those convictions as well.



IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    )
    )
    )
       v.                  )    No.   CR 708 - 2015
    )
    )
LAWRENCE TOOMBS    )
   Defendant.    )

## TRIAL COURT OPINION PURSUANT TO Pa.R.A.P. 1925(a)

This is the Court's Pa.R.A.P. 1925(a) Opinion on the Defendant's appeal from the order dated July 11, 2016 denying the Defendant's Post Sentence Motion. This Court's reasoning regarding the issues the Defendant raises in his Concise Statement of Matters Complained of on Appeal is as follows.

### Factual Background and Procedural History

On October 23, 2014, the Defendant a member of the Washington Community Federal Credit Union, now known as CHROME Federal Credit Union (hereinafter "credit union"), appeared at the Griffin Avenue branch office to complete a financial transaction. Transcript of Non-Jury Trial ("T.T.") p. 8, L. 25; p. 9, LL. 1-3; p. 10, LL. 5-20; LL. 15-22. According to Susan Guffey, a teller at the credit union, the Defendant presented himself to her with a check payable to him dated October 15, 2014 for six thousand eight hundred and eighty dollars and thirty cents ($6,880.30). *Id.* at p. 15, LL. 15-24; p. 27, LL. 18-19, 22-23; *see* Exhibit 1. The teller testified that the check was a "non-recognized check," meaning that it was not a local paycheck, a social security check, a pension check, or a check from "companies in the area." T.T. p. 16, LL. 18-23. In addition, the check was not drawn on a bank doing business in Washington County. *Id.* at p.

16, LL. 24-25. Consequently, the teller inquired about the type of check the Defendant was presenting. The Defendant, however, did not understand the teller's question. She, therefore, asked the Defendant where he got the check, to which he responded "the mail" because "he won a sweepstakes." *Id.* at p. 17, LL. 4-12.

The Defendant's response drew the teller's concern that the check may be a scam. *Id.* at p. 17, LL. 13-14. As a result, the teller asked the Defendant what kind of sweepstakes had he won, but the Defendant was unable to answer the question. *Id.* at p. 17, LL. 19-25; p. 18, LL. 1-3. The Defendant gave the teller a letter (that accompanied the check) which she described as "bogus" looking because "there were cut and paste icons at the top." *Id.* at p. 18, LL. 5-7; p. 19, LL. 20-24. The teller then informed the Defendant that the check looked fraudulent and advised him to report this matter to the police so that they could investigate. *Id.* at p. 18, LL. 10-13. This answer did not satisfy the Defendant. Therefore, the teller left her station to inquire with the deposit process department. *Id.* at p. 18, LL. 14-16.

The teller showed the check and letter to the head of the deposit process department. That person also believed that the check was fraudulent and advised the teller not to accept it for deposit. *Id.* at p. 18, LL. 20-25; p. 45, LL. 8-14. Again, the teller informed the Defendant that the credit union was unable to accept the check and suggested that he notify the police because this was a scam. *Id.* at p. 19, LL. 1-4. The Defendant then left with the check and the letter. *Id.* at p. 19, LL. 18-19; p. 20, LL. 23-25, p. 21, LL. 1-5.

The following day, the Defendant presented himself to the Racetrack Road office of the credit union to deposit the same check. *Id.* at p. 28, LL. 2-11; p. 64, LL. 15-25; p. 65-67. A teller at this branch accepted the endorsed check and put a two-business day hold on the amount for deposit into the Defendant's savings account. *Id.* at p. 29, LL. 23-25; p. 30; p. 31, LL. 3-17; p.

2

36; *see* Exhibits 1 & 2. A hold is customary for a large check deposit. The hold should have been for five days, according to credit union policy, because the check was greater than $5,000. T.T. p. 32, LL. 11-23.

On October 28, 2014, $6,500 was withdrawn from the Defendant's credit union savings account at the Racetrack Road office. *Id.* at p. 33, LL. 11-14; *see* Exhibit 3. The withdrawal receipt for the $6,500 included the driver's license number for the person making the withdrawal request. The number belonged to the Defendant's Pennsylvania Driver's License. T.T. p. 37, LL. 7-8; p. 82, LL. 16-25. The Defendant ultimately depleted all $6,880.30 from his savings account. *Id.* at p. 37, LL. 15-20.

After these withdrawals, the credit union received notice from Mid-Atlantic, the clearinghouse company used for processing checks, that the $6,880.30 check that the Defendant deposited on October 24, 2014 was fraudulent. More specifically, on October 29, 2014, Mid-Atlantic returned the check with the words "altered or fictitious" stamped thereon. *Id.* at p. 26, LL. 2-19; p. 29, LL. 6-8; p. 56, LL. 10-12; p. 57, LL. 5-6.

Anthony Vincequerra, a collector for the credit union, contacted the Defendant after being notified by Mid-Atlantic that the check was "altered or fictitious." *Id.* at p. 57, LL. 15-19. The Defendant informed Mr. Vincequerra that he had already spent the money on a car. *Id.* at p. 57, LL. 20-25. Thereafter, Mr. Vincequerra attempted to schedule several meetings with the Defendant to discuss converting the $6,880.30 into a car loan with the credit union having a lien on the title. *Id.* at p. 58, LL. 19-23; p. 60, LL. 1-8. Each time the Defendant responded that he was unable to make the meeting. *Id.* at p. 59, LL. 1-5. Consequently, Mr. Vincequerra contacted the Pennsylvania State Police. *Id.* at p. 59, LL. 5-12.

3

Trooper Arndt was assigned to the case to investigate and he contacted the Defendant by telephone on December 11, 2014 to discuss the matter. *Id.* at p. 79, LL. 8-16. The Defendant stated that he did not purchase a car with the $6,880.30 check. *Id.* at p. 80, LL. 12-22. Further, the Defendant told Trooper Arndt that he won the Publisher's Clearinghouse Sweepstakes. *Id.* at p. 81, LL. 1-3. The check that the Defendant received, however, was from ROAR Logistics. *See* Exhibit 1. The trooper informed the Defendant that he must contact the credit union by December 19, 2014 to make payback arrangements. *Id.* at p. 81, LL. 13-23. The Defendant never contacted the credit union. *Id.* at p. 82, L. 15.

The Defendant was charged with the following counts: (1) Forgery, a felony of the third degree; (2) Theft by Unlawful Taking, a felony of the third degree; (3) Theft by Deception, a felony of the third degree; (4) Bad Checks, a misdemeanor of the first degree; and (5) Receiving Stolen Property, a felony of the third degree. A non-jury trial was held on May 19, 2016. The Defendant's counsel presented a Motion for Judgment of Acquittal at the conclusion of the Commonwealth's case based on insufficiency of the evidence. This Court denied the motion and the trial proceeded. Based on the testimony and evidence provided, this Court found the Defendant guilty of all charges. The Court imposed an aggregate sentence of sixteen (16) to thirty-two (32) months of incarceration in a state correctional institution.[1] The Defendant filed a timely Post-Sentence Motion, which requested a new trial based on the weight of the evidence. On July 11, 2016, the Court denied the Defendant's request for a new trial. On September 29, 2016, the Court reinstated the Defendant's appellate rights upon consideration of the Defendant's

---

[1] The Defendant received sixteen (16) to thirty-two (32) months incarceration at Counts 1, 3, and 4, to run concurrently. Count 2 and Count 5 merged with Count 3 and no further penalty was imposed. The Court found the Defendant to be eligible for the RRRI program, which reduced his minimum sentence to twelve (12) months. In addition, the Defendant was ordered to pay restitution in the amount of $6,717.43 to the credit union.

4

Petition for Nunc Pro Tunc Relief/Reinstatement of Appellate Rights. The Defendant subsequently filed a timely appeal to the Superior Court.

In his Concise Statement of Matters Complained of on Appeal, the Defendant alleges that the trial court erred as a matter of law in denying the Defendant's Motion of Judgment of Acquittal based on sufficiency of the evidence. Specifically, the Defendant contends the following:

(A) the trial court erred in finding sufficient evidence to convict the Defendant of Forgery despite the lack of evidence supporting the use of a fraudulent writing;

(B) the trial court erred in finding sufficient evidence to convict the Defendant of Theft by Unlawful Taking despite the fact that the Defendant did not intend to deprive the alleged victim of the funds and was actively making payments towards the amount alleged to have been taken;

(C) the trial court erred in funding sufficient evidence to convict the Defendant of Theft by Deception despite the fact that the Defendant was not intentionally withholding the funds received and was actively paying back the amount to the alleged victim;

(D) the trial court erred in finding sufficient evidence to convict the Defendant of Bad Checks when no evidence was presented to support the fact that the check would not be honored by the drawee; and

(E) the trial court erred in finding sufficient evidence to convict the Defendant of Receiving Stolen Property when there was evidence presented that the Defendant was repaying the alleged victim.

In addition to the above, the Defendant alleges in his Concise Statement of Matters Complained of on Appeal that the trial court erred as a matter of law in denying the Defendant's request for a new trial when the weight of the evidence did not support a conviction on all counts.

This Court's reasoning regarding the issues the Defendant raises in his Concise Statement of Matters Complained of on Appeal is as follows.

5

<u>Legal Analysis</u>

The Court will begin by addressing the Defendant's contentions regarding sufficiency of the evidence. "[I]n evaluating a challenge to the sufficiency of the evidence, [the trial court] must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established by beyond a reasonable doubt." *Commonwealth v. Little*, 879 A.2d 293, 296-97 (Pa. Super. Ct. 2005). This deferential standard of review is not modified in cases involving a bench trial, because "the province of a trial judge sitting without a jury is to do what a jury is required to do." *Commonwealth v. Lambert*, 765 A.2d 306, 362 (Pa. Super. Ct. 2000) (quoting *Commonwealth v. Lemons*, 171 A.2d 785, 788 (Pa. 1961)). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Swerdlow*, 636 A.2d 1173, 1176 (Pa. Super. Ct. 1994) (quoting *Commonwealth v. Hardcastle*, 546 A.2d 1101, 1105 (Pa. 1988)). Unless the evidence presented at trial is "so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances," the verdict is not to be changed on appeal. *Commonwealth v. Davis*, 799 A.2d 860, 866 (Pa. Super. Ct. 2002) (quoting *Commonwealth v. Seibert*, 622 A.2d 361, 363 (Pa. Super. Ct. 1993)).

As noted above, the Defendant was charged with five counts. With respect to Count 1, Forgery, to convict a defendant of this crime, the Commonwealth must prove "that there was a false writing, that the instrument was capable of deceiving, and that the defendant intended to defraud." *Commonwealth v. Fisher*, 682 A.2d 811, 815 (Pa. Super. Ct. 1996) (citation omitted). Often, courts look to "the totality of the defendant's conduct to infer fraudulent motive."

6

*Commonwealth v. Bollinger*, 418 A.2d 320, 324 (Pa. Super. Ct. 1979). The Commonwealth is not required to prove that a defendant was the forger, only that he or she had knowledge that he or she facilitated a fraud. *See Commonwealth v. Rosenzweig*, 522 A.2d 1088, 1092 (Pa. 1987) (the act of forgery complete when a defendant endorsed a check without authorization); *Commonwealth v. Williams*, 571 A.2d 423, 426 (Pa. Super. Ct. 1990) (defendant who purchased blank money order from an individual outside a post office, filled in her own name as original purchaser and payee, and then presented it for payment made both a false execution and a false representation and, therefore, can be convicted of forgery).

Herein, the Defendant appeared at the credit union with a substantial check from ROAR Logistic, a company not from the Washington County area, supposedly for winning a sweepstakes that he did not enter. When attempting to deposit the check, the Defendant was informed by the credit union teller, a person trained to identify fictitious checks, that the check was fraudulent and part of a scam. Further, the teller advised the Defendant that he should inform the police of the scam so that they could conduct an investigation. When the Defendant was not satisfied with the teller informing him that the check was fraudulent, the teller inquired with the person in charge of the deposit process department. After presenting the check and accompanying letter to the co-worker, who also concluded the check was bogus, the teller again informed the Defendant that the check was fraudulent, that the credit union would not accept it and that he should notify the police. Nevertheless, even after being advised by financial institution employees who are trained to recognize fraudulent negotiable instruments that the check was a fraud and part of a scam, the Defendant again attempted to deposit the same check at a different credit union branch the following day.

7

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner and considering the totality of the Defendant's conduct, the trial court did not err in finding sufficient evidence to convict the Defendant of Forgery. The evidence presented at the non-jury trial established that the Defendant endorsed a check with his name and presented it for deposit after being informed that it was fraudulent by two bank employees. As such, the Commonwealth proved beyond a reasonable doubt that the Defendant had knowledge that he facilitated a fraud.

With respect to Count 2, Theft by Unlawful Taking, this Court will not address the Defendant's contention because this charge merged with that of Theft by Deception, which is discussed immediately below.

Regarding, Count 3, Theft by Deception, "[a] person is guilty of theft if he intentionally obtains or withholds property of another by deception." 18 Pa.C.S. § 3922(a). In turn, "[a] person deceives if he intentionally: (1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise; (2) prevents another from acquiring information which would affect his judgment of a transaction; or (3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship." *Id.* In *Commonwealth v. Williams*, two persons stole a $22 money order immediately after it was purchased from a U.S. postal service office by the victim. 571 A.2d 423 (Pa. Super. Ct. 1990). The thieves then sold it to the appellant who knew that one of the two persons selling the money order was a known drug user. The appellant purchased the money order for $10 and then took it to the post office to cash it after writing in her name as both purchaser and payee. The post office would not cash the money

8

order because the clerk recognized it as the one he had sold to the victim. In a non-jury trial, the trial court found the appellant's testimony—that she believed the drug user when he told her that the money order was not stolen—to be implausible, "especially in light of the fact that she lied when the postal clerk questioned her about how and when she purchased the money order." *Id.* at 424-25. The trial court found the appellant guilty. In affirming the judgment of sentence, the Superior Court determined that the appellant "would have been guilty of attempted theft by deception and nothing else if she had merely presented a completed money order and represented herself as the intended payee." *Id.* at p. 426.

Like the postal clerk questioning the appellant about the provenance of the money order, two bank employees questioned the Defendant herein about the authenticity of the sweepstakes check he presented for deposit. The employees, trained to recognize fraudulent negotiable instruments, informed the Defendant that the check was fraudulent and that he should inform the police regarding the scam. He refused to heed the warning and appeared at a different credit union branch the following day to deposit the check, which was ultimately returned to the credit union as "altered or fictitious." In line with *Williams*, the mere presentment and deposit of the fraudulent check was sufficient for the finding of guilty of theft by deception. Consequently, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and considering the totality of the Defendant's conduct, the trial court did not err in finding sufficient evidence to convict the Defendant of Theft by Deception.

With respect to Count 4, Bad Checks, the Commonwealth is not required to prove that a defendant intended to defraud. *Commonwealth v. Mutnik*, 406 A.2d 516, 517-18 (Pa. 1979). The Commonwealth must prove that the Defendant "passed" a check to the credit union "knowing" that it would not be honored. *See* 18 Pa.C.S § 4105(a); *see also Mutnik*, 406 A.2d 516. As

9

reiterated above, the Defendant was told by two credit union employees that the check issued to him was fraudulent and that he should inform the police regarding the scam. Based on this evidence, the Court found that the Defendant knew that the check would not be honored and that he nevertheless proceeded to pass the check to another branch office the following day. Viewing the evidence in the light most favorable to the Commonwealth as verdict winner and considering the totality of the Defendant's conduct, the trial court did not err in finding sufficient evidence to convict the Defendant of Bad Checks. With respect to Count 5, Receiving Stolen Property, this Court will not address the Defendant's contention because this charge merged with that of Theft by Deception, which is discussed above.

Throughout the Defendant's claims regarding sufficiency of the evidence, he points to evidence presented that he was actively repaying the credit union. During the non-jury trial, Mr. Vincequerra testified that $32.34 is electronically transferred directly into the Defendant's savings account each month. T.T. p. 55, LL. 6-8; p. 62, LL. 11-25. Mr. Vincequerra acknowledged that this monthly deposit is reducing the $6,880.30 debt owed to the credit union. *Id.* at p. 70, LL. 13-16. The electronic deposit, however, was established before the Defendant deposited the fraudulent check with the credit union. *Id.* at p. 63, LL. 5-7. Therefore, the trial court found this to be irrelevant when determining whether the Defendant committed the crimes charged.

For the aforementioned reasons, the trial court did not err as a matter of law in denying the Defendant's Motion of Judgment of Acquittal based on sufficiency of the evidence. Turning to the Defendant's second category of claims in his Concise Statement of Matters Complained of on Appeal, the Defendant contends that the trial court erred when it denied the Defendant's request for a new trial when the weight of the evidence did not support a conviction on all

10

counts. "A claim that the verdict was contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). Therefore, the trial court is not obligated to see the evidence in a light most favorable to the verdict winner. *Id.* (citing *Tibbs v. Florida*, 457 U.S. 31, 37-38 (1982)). The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of witnesses. *Commonwealth v. Marks*, 704 A.2d 1095, 1099 (Pa. Super. Ct. 1997). Any conflict in the testimony goes to the credibility of the witnesses and is solely to be resolved by the factfinder. *Commonwealth v. Price*, 616 A.2d 681, 685 (Pa. Super. Ct. 1992). A trial court may award a new trial on the basis that the verdict was contrary to the weight of the evidence "only where the verdict is so contrary to the evidence as to shock one's sense of justice and make the award of a new trial imperative." *Commonwealth v. Mason*, 741 A.2d 708, 715 (Pa.1999); *Commonwealth v. Auker*, 681 A.2d 1305, 1316 (Pa. 1996).

The Defendant's claim that the weight of the evidence did not support the verdict is premised upon the same reasons why there was insufficient evidence to support a conviction. The Court must also mention that the Defendant's behavior subsequent to depositing the $6,880.30 check was telling and implicating. As set forth above, Mr. Vincequerra contacted the Defendant after being notified by Mid-Atlantic that the check was "altered or fictitious" and attempted to schedule several meetings with the Defendant to discuss converting the $6,880.30 into a car loan. Each time the Defendant responded that he was unable to make the meeting. The Defendant subsequently told Trooper Arndt that he did not purchase a car with the $6,880.30 check even though that is what he had told Mr. Vincequerra. In addition, the Defendant told Trooper Arndt that he had won the Publisher's Clearinghouse Sweepstakes while the check that the Defendant had received was from ROAR Logistics. Trooper Arndt informed the Defendant

11

that he must contact the credit union by December 19, 2014 to make payback arrangements, but the Defendant failed to do so. The trial court rightfully concluded that the Defendant's evasive conduct is evidence of guilty knowledge. *See Commonwealth v. Thoeun Tha*, 64 A.3d 704, 714 (Pa. Super. Ct. 2013). Based upon this and the entire analysis above, this Court concludes that the verdict would not shock the conscious. Accordingly, the Court did not err as a matter of law in denying the Defendant's request for a new trial based on the weight of the evidence.

BY THE COURT,

Gary Gilman, Judge          11/17/16